# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**CHRISTINA D. BOERSMA,**

    **Plaintiff,**

    v.                                                **Civil Action 2:17-cv-724**
                                                          **Judge Algenon L. Marbley**
                                                          **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL
SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Christina D. Boersma filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her Title II Disability Insurance Benefits and Title XVI Supplemental Security Benefits applications. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 12) be **OVERRULED**, and that judgment be entered in favor of Defendant.

    **I.**        **BACKGROUND**

Plaintiff previously filed applications for Title II and Title VII benefits on September 8, 2011, alleging disability onset on August 15, 2008. On July 11, 2013, an administrative law judge denied those applications. (Tr. 144–52, PAGEID #: 189–97).

Plaintiff filed her applications for benefits, which are the subject of this adjudication, on July 25, 2013, alleging that she has been disabled since August 15, 2008, due to possible diabetes, fibromyalgia, scoliosis, nerve problems, bulging disc, migraines, radiculopathy, and degenerative disc disease. (Tr. 290–98, PAGEID #: 337–45; Tr. 298–306, PAGEID #: 345–53; Tr. 203, PAGEID #: 249). Plaintiff later amended her onset date to August 1, 2013. (Tr. 101,

PAGEID #: 145). Plaintiff was denied benefits on September 26, 2013 (Tr. 203–18, PAGEID #: 249–64), and upon reconsideration (Tr. 222–33, PAGEID #: 268–79). Plaintiff filed a Request for Hearing (Tr. 234–35, PAGEID #: 280–81), and an administrative hearing was held on February 11, 2016 (Tr. 97–140, PAGEID #: 141–84). Administrative Law Judge Deborah E. Ellis (the "ALJ") denied Plaintiff's claim in a decision issued on June 24, 2016. (Tr. 52–74, PAGEID #: 96–118). The Appeals Council denied Plaintiff's request for review, adopting the ALJ's decision as the Commissioner's final decision. (Tr. 1–6, PAGEID #: 45–50).

Plaintiff filed this case on August 17, 2017 (Doc. 1), and the Commissioner filed the administrative record on October 23, 2017 (Doc. 9). Plaintiff filed a Statement of Specific Errors on December 8, 2017 (Doc. 12), and the Commissioner responded on January 16, 2018 (Doc. 13). Plaintiff did not file a reply.

### A. Relevant Hearing Testimony

Plaintiff testified at the administrative hearing. For the past four years, she has lived in a two-story house, with the bedrooms upstairs. (Tr. 106–107, PAGEID #: 150–51). She resides with her husband, her four children (ages five, six, eight and thirteen), and her brother. (Tr. 107–108, PAGEID #: 151–52). The family has a dog and a cat; taking care of the dog is the children's responsibility. (Tr. 107, PAGEID #: 151). Plaintiff's husband works a later shift and is normally gone from the house from 3:00 p.m. to 2:00 a.m. (*Id.*). Plaintiff's youngest child was in preschool at the time of the hearing, but, in earlier years, Plaintiff took care of him with help from her twenty-seven-year-old brother. (Tr. 108, PAGEID #: 152). Plaintiff testified that her brother is developmentally disabled and requires "verbal care" in that she tells him what to do. (*Id.*).

2

Although Plaintiff has a valid driver's license, she drives infrequently because, according to her testimony, she is afraid her foot is going to go numb while driving. (Tr. 108, PAGEID #: 152). She testified that this has happened before, but she has never had an accident. (Tr. 109, PAGEID #: 153). Plaintiff completed high school without difficulty. (*Id.*). She had no training after high school and began working in the fast food industry, where she worked for ten years, mostly as an assistant manager. (*Id.*) Plaintiff described her job as involving reconciling the drawers, handling money, making the deposit, cleaning, and helping make food and take orders (Tr. 110, PAGEID #: 154). She described herself as "a crew person with a manager's tag." (*Id.*). She testified that she was responsible for interviewing and hiring staff as well as disciplining them. (Tr. 110–11, PAGEID #: 154–55).

Her employment ended in 2008 when she quit her job after a dispute with a manager. (Tr. 111, PAGEID #: 155). She testified that she did not attempt to find other employment because she was three-months pregnant with her third child. (*Id.*). Plaintiff testified that she did not return to work after that because she was "home with the kids." (*Id.*). She additionally testified that the "pain started to settle in after my third pregnancy," and by her fourth pregnancy, she "was in really bad shape" and "never returned back to work." (Tr. 111–12, PAGEID #: 155–56). Plaintiff testified that she started seeking help from doctors in 2010. (Tr. 112, PAGEID #: 156). Regarding her pain, Plaintiff testified that she suffers from pain in her back and hips and has pressure points in her upper shoulders. (Tr. 112, PAGEID #: 156). In response to the ALJ's questioning, Plaintiff testified that she has two to four headaches per month, and she described her migraine headaches as lasting "a good hour to two hours," and as her head being sore for hours thereafter. (Tr. 127, PAGEID #: 171).

During the hearing, the ALJ asked Plaintiff a number of questions about Plaintiff's physical abilities based upon her medical records. For example, the ALJ relied on specific medical records to ask the following:

> Q All right. So let's start out with B-21-F. . . . [Dr. Lindsay] says here, "I haven't seen her for a while. She reports to me she can't shave her legs, but they were shaved; she can't do her hair, but her hair is up; says her legs are swollen, but there's no edema.
>
> And then there are also notes from B-22-F that you were, told your physical therapist that you were a little slower because you were so active with the kids over the weekend.
>
> There's another note that you walked a lot over the weekend, and another one that you were shoveling the driveway over the weekend.
>
> A Yes.
>
> Q So tell me about that.
>
> A I try to be as active as I possibly can. There is days that I do nothing but lay around, but I like to be as active as I can for my children. As far as Dr. Lindsay, my husband shaves my legs for me because I have a really hard time in the bathtub. I do put my own hair up. It's really hard for me to do that. It's a mess, but I do that on my own. I do try to walk at least a block or two when I'm able to.

(Tr. 118, PAGEID #: 162).

The ALJ also questioned Plaintiff regarding her medication usage as opposed to exercise to treat Plaintiff's fibromyalgia. (Tr. 114–17, PAGEID #: 158–61). Plaintiff also testified that she did not get along well with her one of her physicians, Dr. Lindsay. (Tr. 119, PAGEID #: 163).

A Vocational Expert ("VE") also testified at the hearing. He testified that Plaintiff's past work as a manager for fast food services is generally performed at the light level of exertion, but she performed it at the heavy level. (Tr. 133, PAGEID #: 177). The job is semi-skilled. (*Id.*). The VE testified that an individual of the same age and with the same education and work

experience as Plaintiff, who could lift and carry, push and pull ten pounds frequently and less than ten pounds occasionally; who could sit for a total of six hours during the day; who could stand and/or walk a total of two hours during the workday; who should only occasionally climb ramps and stairs and never climb ladders and scaffolds; who could occasionally balance, stoop, kneel, crouch and crawl; who should avoid concentrated exposure to unprotected heights and moving mechanical parts, extreme cold, extreme heat, and vibrations; who would be limited to performing simple, routine, repetitive tasks, but not at an assembly line pace; and who would be limited to tolerating few changes in the routine work setting; could not perform Plaintiff's past work. (Tr. 134, PAGEID #: 178).

The VE testified that the above described individual could perform sedentary unskilled jobs such as letter addresser, document preparer, and surveillance system monitor. (Tr. 134–35, PAGEID #: 178–79). The VE also noted that the tolerance for absenteeism in the jobs he had cited would be no more than one day per month and no more than five days per a twelve month period. (Tr. 136, PAGEID #: 180). He stated that during the initial probationary period as few as two absences could result in dismissal. (*Id.*).

**B. Medical Records**

Neither Plaintiff nor the Commissioner summarized the relevant medical records in this case. However, the ALJ aptly did so:

> The claimant's medical records indicate a history of treatment for fibromyalgia, including medication, prior to the alleged onset date. (Ex. Bl F/7, 10-11; B2F/5-20). On August 1, 2013, the claimant went to the emergency room due to fibromyalgia pain and a headache. (Ex. B3F/7). A positive trigger point was noted in the right trapezius. (Ex. B3F/10).
>
> At an examination in October 2013, the claimant had tenderness throughout her normal fibromyalgia tender points. (Ex. B6F/17). However, she had full strength in the extremities, and sensation was intact. (Ex. B6F/17). Her gait was

5

normal. (Ex. B6F/17). She reported that she continued to try to exercise for her fibromyalgia. (Ex. B16F/18).

At a follow-up visit in November 2013, the claimant reported pain in her entire body. (Ex. B6F/12). Upon examination, the doctor noted that she did not appear to be in extreme pain. (Ex. B6F/13). There was tenderness throughout the upper and lower extremities, as well as the paraspinal area. (Ex. B6F/13). However, she had full strength and full range of motion of the extremities. (Ex. B6F/13). The claimant received an acupuncture treatment at that time. (Ex. B6F/13).

In December 2013, the claimant reported no pain relief following acupuncture. (Ex. B6F/7). She reported that the majority of her pain was in her legs, back and hips at that time. (Ex B6F/8). Examination findings were consistent with previous findings. (Ex. B6F/9). The doctor noted that the claimant sat comfortably in no acute distress. (Ex. B6F/9). The claimant again underwent acupuncture for her pain. (Ex. B6F/10).

Medical records from her family practitioner during this time show that she was prescribed medication, including Vicodin, for her pain. (Ex. B8F). A note from November 2013 states that she had been weaned off Vicodin for a short period but that she could not tolerate the pain. (Ex. B8F/4). At a visit to the family practitioner in March 2014, the claimant reported that she was doing well with her pain medication. (Ex. B8F/19).

In October 2014, the claimant visited her family practitioner and reported that she did not think she was making progress with her then specialist. (Ex. B14F/11). She reported breakthrough pain in her legs and back. (Ex. B14F/11). The doctor recommended that she wean off medication and consult another specialist. (Ex. B14F/12).

In December 2014, the claimant consulted a rheumatologist regarding her fibromyalgia and reports of joint and muscle pain. (Ex. B15F/2). Upon examination, there were multiple positive tender points consistent with fibromyalgia but no evidence of muscle weakness. (Ex. B15F/3). There was also tenderness of the left wrist. (Ex. B15F/3). X-rays of the hands did not show evidence of inflammatory arthritis. (Ex. B15F/4). The rheumatologist stated that there was no evidence of inflammatory arthritis on examination and that the claimant's symptoms were consistent with fibromyalgia. (Ex. B15F/4).

In August 2015, the claimant visited one of her doctors and reported back pain that radiated down her bilateral legs and swollen legs. (Ex. B21F/10). Upon examination, the examining doctor noted an exaggeratedly antalgic gait. (Ex. B21F/13). There was no edema of the lower extremities. (Ex. B21F/13). There was tenderness of multiple tender points and across the lumbar paraspinal region. (Ex. B21F/13). She also had limited range of motion of the lumbar spine. (Ex. B21F/13). The doctor also noted that the claimant reported that she could not

shave her legs due to pain but that the claimant's legs were shaved at the examination. The doctor further noted that the claimant reported that she could not care for her hair due to pain but that the claimant's hair was up. (Ex. B21F/13). The doctor advised her to exercise to treat her fibromyalgia pain. (Ex. B21F/14).

The medical records also show that the claimant engaged in physical therapy for her pain, especially her back pain. (Ex. B22F; B23F). She was discharged from therapy in October 2015 and reported improved movement and strength. (Ex. B22F/11). In October 2015, the claimant again consulted a rheumatologist, who again determined that the claimant's symptoms were due to fibromyalgia rather than inflammatory arthritis. (Ex. 12F). Examinations showed positive tender points but no synovitis. (Ex. B24F/3, 12).

….

The medical records show that on August 1, 2013, the claimant went to the emergency room due to a headache and fibromyalgia pain. (Ex. B3F/7). A CT scan of the head was negative. (Ex. B3F/10; B1OF/22). At a doctor visit in October 2013, the claimant reported a history of migraines that were worsening. (Ex. B6F/15). She reported increased headache pain with light and noise and nausea associated with bad headaches. (Ex. B6F/16). She reported that she had headaches up to three times per week. (Ex. B6F/16). The doctor prescribed medication for her headaches, including Topamax and Imitrex. (Ex. B6F/18). At a follow-up visit in November 2013, the claimant reported that her headaches had improved. (Ex. B6F/12). The claimant's medication was continued. (Ex. B6F/13).

In November 2014, the claimant went to the emergency room due to headache and nausea. (Ex. B12F/17). She was treated with medication and discharged in good condition. (Ex. B12F/20- 21). The claimant returned to the emergency room with a headache in December 2014. (Ex. B12F/9). She was again treated with medication and reported improvement. (Ex. B12F/15). The claimant also visited her primary care provider in December 2014, who restarted her prescription for Topamax. (Ex. B14F/16).

In March 2015, the claimant visited her primary care provider and reported migraine headaches for several weeks. (Ex. B14F/25). The doctor prescribed a new medication for her headaches. (Ex. B14F/26). The claimant again went to the emergency room due to migraine and nausea in August 2015. (Ex. B13F/1). She was treated with medication, and her symptoms resolved. (Ex. B13F/6).

(Tr. 61–64, PAGEID #: 105–108).

### C. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements through December 31, 2013, and that she has not engaged in substantial gainful activity since August 1, 2013, her alleged onset date. (Tr. 58, PAGEID #: 102). The ALJ determined that Plaintiff suffers from the following severe impairments: "fibromyalgia, carpal tunnel syndrome, migraines, and organic mental disorder . . . ." (*Id*.). At step three, the ALJ found that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of any of the impairments in the Listings of Impairments. (Tr. 59–60, PAGEID #: 103–104). The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, except she:

> . . . can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently handle and finger with the left hand; . . . should avoid concentrated exposure to unprotected heights moving mechanical parts, extreme cold, extreme heat and vibration. . . . can perform simple, routine, repetitive tasks but not at an assembly line pace, and . . . can tolerate few changes in the routine work setting. . . . would be absent from work up to one time per months but no more than five times per year due to her migraines.

(Tr. 60, PAGEID #: 104). At step four of the sequential evaluation, the ALJ concluded that Plaintiff was not capable of performing any of her past relevant work. (Tr. 66, PAGEID #: 110). At step five, the ALJ found that Plaintiff was not disabled because there were a significant number of jobs in the national economy which Plaintiff could perform, including the sedentary unskilled jobs of letter addresser, document preparer, and surveillance system monitor. (Tr. 67–68, PAGEID #: 111–12).

### II. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." "[S]ubstantial evidence is defined as

'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To that end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 1:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

### III. DISCUSSION

Plaintiff has assigned three errors.

#### A. Consideration of Fibromyalgia

In her first assigned error, Plaintiff disputes the ALJ's consideration of her fibromyalgia at steps three, four, and five of the sequential analysis. (Doc. 12 at 9–13). Social Security Ruling (SSR) 12-2p articulates how the Commissioner determines if a claimant's fibromyalgia qualifies as a medically determinable impairment and also explains how fibromyalgia, as a medically determinable impairment, factors into the sequential disability evaluation. 2012 WL 3104869 at *1–6. In this case, the ALJ found Plaintiff's fibromyalgia to be a severe medically determinable impairment. (Tr. 58, PAGEID #: 102). Plaintiff agrees with that determination but disputes the ALJ's further consideration of fibromyalgia in two ways.

First, Plaintiff disputes the ALJ's consideration of fibromyalgia at step three of the sequential evaluation. Step three of the sequential evaluation considers whether Plaintiff had an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404. Subpart P. Appendix 1 ("the Listings"). 20 C.F.R. § 404.1520. "At step

9

three of the evaluation process, it is the burden of the claimant to show that [she] meets or equals the listed impairment." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004). Accordingly, "[w]hen a claimant alleges that he [or she] meets or equals a listed impairment, [she] must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728. The Sixth Circuit has emphasized that an ALJ is not subject to a "heightened articulation standard" in considering the listing impairments. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). Instead, the Court simply reviews whether substantial evidence supports the ALJ's findings. *See id.* In doing so, "a court must read the ALJ's step-three analysis in the context of the entire administrative decision, and may use other portions of a decision to justify the ALJ's step-three analysis." *Snoke v. Astrue*, No. 10-1178, 2012 LEXIS 21930, at *19 (S.D. Ohio Feb. 22, 2012) (citing *Bledsoe*, 165 F. App'x at 411).

Although she did not assert this argument before the ALJ, Plaintiff now claims that her fibromyalgia is equivalent to Listing 14.09(D), Inflammatory Arthritis. To satisfy Listing 14.09(D), a claimant must prove the following:

> Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
> 1. Limitation of activities of daily living.
> 2. Limitation of maintaining social functioning.
> 3. Limitations in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

As an initial matter, even where a claimant suffers from fibromyalgia, an ALJ is not required to consider Listing 14.09(D). *Colon-Lockhart v. Comm'r of Soc. Sec.*, No. 14-14336, 2015 U.S. Dist. LEXIS 177229, at *16 (E.D. Mich. Dec. 29, 2015) ("SSR 12-2p, 2012 SSR LEXIS 1 does not require the ALJ to consider whether Plaintiff met Listing 14.09(D)."); *White*

*v. Colvin*, No. 12-cv-11600, 2013 U.S. Dist. LEXIS 133038, at *36–37 (E.D. Mich. June 27, 2013) (same). Additionally, Plaintiff has not argued that the record shows that she suffers from at least two of the "constitutional symptoms," which include "severe fatigue, fever, malaise, or involuntary weight loss." (*See generally* Doc. 12 at 9–13). Such symptoms are a necessary component of equaling Listing 14.09(D). *See Colon-Lockhart*, No. 2015 U.S. Dist. LEXIS 177229, at *16–17 (noting threshold requirements for satisfying Listing 14.09(D)).

Even more important, the ALJ expressly found that Plaintiff did not have marked limitations of activities of daily living, of maintaining social functioning, or in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. To the contrary, the ALJ found Plaintiff's limitations in these areas to be only mild or moderate:

> In activities of daily living, the claimant has mild restriction. The claimant testified that she tries to stay as active as possible but that there are days that she does nothing but lay down due to her physical symptoms. She testified that she cooks, cleans, goes grocery shopping and does the laundry with help from her brother. The claimant testified that before her youngest child started preschool that she cared for the child without difficulty. In social functioning, the claimant has mild difficulties. The claimant was agitated at a mental status examination. (Ex. B5F/11). Other examinations showed depressed, anxious, angry and irritable mood. (Ex. B20F/4, 7, 8, 10). However, the claimant maintained eye contact at mental status examinations. (Ex. B5F/11, 13; B20F/4). In addition, the claimant was cooperative at a psychological consultative examination. (Ex. B7F/3). With regard to concentration, persistence or pace, the claimant has moderate difficulties. At a psychological consultative examination, she successfully completed tasks measuring recent, remote and immediate memory. (Ex. B7F/3). However, she demonstrated difficulty with attention. (Ex. B7F/3). She was unable to spell a five-letter word backward, and she was unable to calculate serial sevens. (Ex. B7F/3). The claimant's treatment records show that impairment of memory, attention and concentration were not noted at some examinations. (Ex. B20F/4, 7). Trouble concentrating was noted at other examinations, however. (Ex. B20F/8, 10, 12).

(Tr. 59, PAGEID #: 103).

For these reasons, the Court concludes that, although the ALJ did not expressly refer to Listing 14.09(D), her decision reasonably explains why Plaintiff's condition failed to satisfy the Listing's requirements.

Second, Plaintiff asserts that, when crafting Plaintiff's RFC, the ALJ should have accounted for the widespread pain Plaintiff's fibromyalgia causes. However, as explained more fully below, the ALJ in fact considered this pain. She simply concluded that it was less acute than Plaintiff alleged. As such, there was no error.

**B. Assessment of Plaintiff's Symptoms**

Plaintiff next asserts that the ALJ improperly relied on the absence of objective criteria to find her allegations only partially credible. (Doc. 12 at 14–17).[1] The Court disagrees with Plaintiff's characterization of the decision. First, the ALJ properly identified the relevant standards and articulated the two-step process an ALJ must follow when considering whether there is an underlying medically determinable "impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques–that could reasonably be expected to produce the claimant's pain or other symptoms." (Tr. 60, PAGEID #: 104).

Next, the ALJ thoroughly considered Plaintiff's allegations and compared them to the record. In relevant part, the ALJ explained:

> The claimant alleges that she has been unable to work since the alleged onset date due to possible diabetes, fibromyalgia, scoliosis, nerve problems, bulging discs, migraines, radiculopathy, degenerative disc disease, and memory loss. (Ex. B2E; B4E; B6E). At the hearing, the claimant testified that she is unable to work due to pain, including pain in her back, legs, hips and shoulders. She testified that she cannot stand for very long and has difficulty sitting. In

---

[1] The Court notes that Plaintiff relies on SSR 96-7p. That provision was no longer in effect at the time of the ALJ's decision. *See* SSR 16-3p, 2016 SSR LEXIS 4 (effective March 28, 2016, *see* SSR 16-3p, 2016 SSR LEXIS 4, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims). The Court thus considers whether the ALJ properly applied SSR 16-3p as well as 20 C.F.R. § 404.1529 and SSR 12-2p.

12

addition, the claimant testified that she has migraine headaches. She testified that she has two to four migraines per month, each lasting one to two hours. The claimant also testified that she has pain, numbness, tingling and burning of her wrist. Further, the claimant testified that she sees a mental health counselor once per week. She testified that she does not see a psychiatrist.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

In terms of the claimant's alleged symptoms and limitations, the medical evidence does not support any greater limitation to the claimant's work-related abilities than those in the residual functional capacity set forth herein. Regarding the claimant's fibromyalgia, the claimant's medical records show treatment for pain and findings of tender points at examinations. However, her allegations regarding the intensity of her pain and the effect of her pain on her functioning is not consistent with the medical records. The claimant's movement was generally normal at examinations. In addition, the claimant's doctors recommended exercise to treat her pain.

The claimant's medical records indicate a history of treatment for fibromyalgia, including medication, prior to the alleged onset date. (Ex. B1F/7, 10–11; B2F/5–20). On August 1, 2013, the claimant went to the emergency room due to fibromyalgia pain and a headache. (Ex. B3F/7). A positive trigger point was noted in the right trapezius. (Ex. B3F/10).

At an examination in October 2013, the claimant had tenderness throughout her normal fibromyalgia tender points. (Ex. B6F/17). However, she had full strength in the extremities, and sensation was intact. (Ex. B6F/17). Her gait was normal. (Ex. B6F/17). She reported that she continued to try to exercise for her fibromyalgia. (Ex. B16F/18).

At a follow-up visit in November 2013, the claimant reported pain in her entire body. (Ex. B6F/12). Upon examination, the doctor noted that she did not appear to be in extreme pain. (Ex. B6F/13). There was tenderness throughout the upper and lower extremities, as well as the paraspinal area. (Ex. B6F/13). However, she had full strength and full range of motion of the extremities. (Ex. B6F/13). The claimant received an acupuncture treatment at that time. (Ex. B6F/13).

In December 2013, the claimant reported no pain relief following acupuncture. (Ex. B6F/7). She reported that the majority of her pain was in her legs, back and hips at that time. (Ex B6F/8). Examination findings were consistent with previous findings. (Ex. B6F/9). The doctor noted that the claimant sat

comfortably in no acute distress. (Ex. B6F/9). The claimant again underwent acupuncture for her pain. (Ex. B6F/10).

Medical records from her family practitioner during this time show that she was prescribed medication, including Vicodin, for her pain. (Ex. B8F). A note from November 2013 states that she had been weaned off Vicodin for a short period but that she could not tolerate the pain. (Ex. B8F/4). At a visit to the family practitioner in March 2014, the claimant reported that she was doing well with her pain medication. (Ex. B8F/19).

In October 2014, the claimant visited her family practitioner and reported that she did not think she was making progress with her then specialist. (Ex. B14F/11). She reported breakthrough pain in her legs and back. (Ex. B14F/11). The doctor recommended that she wean off medication and consult another specialist. (Ex. B14F/12).

In December 2014, the claimant consulted a rheumatologist regarding her fibromyalgia and reports of joint and muscle pain. (Ex. B15F/2). Upon examination, there were multiple positive tender points consistent with fibromyalgia but no evidence of muscle weakness. (Ex. B15F/3). There was also tenderness of the left wrist. (Ex. B15F/3). X-rays of the hands did not show evidence of inflammatory arthritis. (Ex. B15F/4). The rheumatologist stated that there was no evidence of inflammatory arthritis on examination and that the claimant's symptoms were consistent with fibromyalgia. (Ex. B15F/4).

In August 2015, the claimant visited one of her doctors and reported back pain that radiated down her bilateral legs and swollen legs. (Ex. B21F/10). Upon examination, the examining doctor noted an exaggeratedly antalgic gait. (Ex. B21F/13). There was no edema of the lower extremities. (Ex. B21F/13). There was tenderness of multiple tender points and across the lumbar paraspinal region. (Ex. B21F/13). She also had limited range of motion of the lumbar spine. (Ex. B21F/13). The doctor also noted that the claimant reported that she could not shave her legs due to pain but that the claimant's legs were shaved at the examination. The doctor further noted that the claimant reported that she could not care for her hair due to pain but that the claimant's hair was up. (Ex. B21F/13). The doctor advised her to exercise to treat her fibromyalgia pain. (Ex. B21F/14).

The medical records also show that the claimant engaged in physical therapy for her pain, especially her back pain. (Ex. B22F; B23F). She was discharged from therapy in October 2015 and reported improved movement and strength. (Ex. B22F/11). In October 2015, the claimant again consulted a rheumatologist, who again determined that the claimant's symptoms were due to fibromyalgia rather than inflammatory arthritis. (Ex. 12F). Examinations showed positive tender points but no synovitis. (Ex. B24F/3, 12).

…

The medical records show that on August 1, 2013, the claimant went to the emergency room due to a headache and fibromyalgia pain. (Ex. B3F/7). A CT scan of the head was negative. (Ex. B3F/10; BlOF/22). At a doctor visit in October 2013, the claimant reported a history of migraines that were worsening. (Ex. B6F/15). She reported increased headache pain with light and noise and nausea associated with bad headaches. (Ex. B6F/16). She reported that she had headaches up to three times per week. (Ex. B6F/16). The doctor prescribed medication for her headaches, including Topamax and Imitrex. (Ex. B6F/18). At a follow-up visit in November 2013, the claimant reported that her headaches had improved. (Ex. B6F/12). The claimant's medication was continued. (Ex. B6F/13).

In November 2014, the claimant went to the emergency room due to headache and nausea. (Ex. B12F/17). She was treated with medication and discharged in good condition. (Ex. B12F/20-21). The claimant returned to the emergency room with a headache in December 2014. (Ex. B12F/9). She was again treated with medication and reported improvement. (Ex. B12F/15). The claimant also visited her primary care provider in December 2014, who restarted her prescription for Topamax. (Ex. B14F/16).

In March 2015, the claimant visited her primary care provider and reported migraine headaches for several weeks. (Ex. B14F/25). The doctor prescribed a new medication for her headaches. (Ex. B14F/26). The claimant again went to the emergency room due to migraine and nausea in August 2015. (Ex. B13F/1). She was treated with medication, and her symptoms resolved. (Ex. B13F/6).

….

In addition to the medical factors discussed above, I have considered additional factors in evaluating the intensity, persistence and limiting effects of the claimant's symptoms. The claimant has reported extensive daily activities that are inconsistent with her allegation that she is unable to work. The claimant's medical records indicate that she cares for her disabled brother. (Ex. B5F/13). At the hearing, the claimant testified that she tries to stay as active as possible but that there are days that she does nothing but lay down. She testified that she cooks, cleans, goes grocery shopping and does the laundry with help from her brother. The claimant testified, however, that she has difficulty making beds due to problems with her wrist. The claimant testified that before her youngest child started preschool that she cared for the child without difficulty. She also testified that she walks one to two blocks when she is able. While these activities do not directly translate to the ability to perform work activity at a specific exertional level or the ability to do a specific job, they do suggest that the claimant's abilities are greater than alleged.

> As shown above, the claimant's doctor noted inconsistencies between the alleged intensity of the claimant's symptoms and her appearance and demeanor at examinations. For instance, an exaggeratedly antalgic gait was noted. (Ex. B21F). In addition, the doctor noted that the claimant's legs were shaved and her hair was up despite the claimant's reports of difficulties performing these tasks. At the hearing, the claimant testified that her husband helped her shave her legs and that she puts her hair up very messily.

(Tr. 61–65, PAGEID #: 105–09).

Plaintiff's argument that this analysis is insufficient is similar to one recently raised in *Belcher v. Comm'r of Soc. Sec.*, No. 1:16-cv-944, 2017 U.S. Dist. LEXIS 119249, at *19–20 (W.D. Mich. July 31, 2017). There, the Court noted that "the ALJ provided an extensive evaluation of Plaintiff's credibility and applied the two-step process called for in SSR 96-7p, 1996 SSR LEXIS 4 and SSR 12-2p, 2012 SSR LEXIS 1." The Court went on to note "[t]his was all that the ruling required on this record, and therefore Plaintiff's claim that the ALJ failed to properly apply SSR 12-2p, 2012 SSR LEXIS 1 is without merit." *Id.*

The Court comes to the same conclusion here. Consistent with 20 C.F.R. § 404.1529 and SSR 12-2p, the ALJ explained how Plaintiff's daily activities, statements to medical professionals, treatment history, medication usage, examination findings, and imaging studies undermined Plaintiff's allegations of work-preclusive limitations. Plaintiff mischaracterizes the ALJ's decision as being too focused on objective findings. (Doc. 12 at 15). The opinion shows otherwise, and the undersigned concludes that the ALJ's analysis was reasonable and supported by substantial evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (noting that an ALJ "is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability").

### C. Step-Five Analysis

Plaintiff next argues that the ALJ erred at step five. At this step of the sequential evaluation process, the ALJ need only establish that a claimant can perform "other work." 20 C.F.R. § 404.1520(f). This burden is met if the ALJ establishes that there is at least one job existing in significant numbers in the national economy that the claimant can perform. 20 C.F.R. § 404.1566(b). Here, the ALJ found that Plaintiff was not disabled based on the vocational expert's testimony that she could perform a significant number of sedentary jobs as a letter addresser, a document preparer, and a surveillance system monitor, given the residual functional capacity. (Tr. 68, PAGEID #: 112).

Plaintiff argues the ALJ's step-five finding is flawed because the vocational expert testified that employers would tolerate no more than five absences per twelve month period, but when starting a job during the probationary period, as few as two absences may be grounds for dismissal. (Doc. 12 at 20 (relying on Tr. 136)). The ALJ's residual functional capacity contained a restriction that Plaintiff would be absent from work up to one time per month but no more than five times per year due to her migraines. (Tr. 60, PAGEID #: 104). Plaintiff argues that the ALJ's RFC is unclear regarding whether Plaintiff's absences would occur in close proximity to one another, with the possibility that her absences would have two absences in two successive months during her probationary period which would be work preclusive. (Doc. 12 at 20).

Plaintiff's suggestion that she may experience headaches causing two absences during an undefined probationary period is speculative. Besides Plaintiff's self-reporting, Plaintiff has identified nothing in the record to indicate that frequent headaches would cause excessive absenteeism. Although the ALJ found that Plaintiff's headaches were a severe impairment (Tr.

17

58), she also found that her subjective complaints about the limitations imposed by those headaches were not entirely credible. Accordingly, this case is similar to *Ditmer v. Astrue*, No. 10-877, 2012 WL 642851, *5 (S.D. Ohio Feb. 28, 2012). There, the Court rejected a similar argument:

> In this case, there was no evidence in the record, other than her own testimony, that Plaintiff's headaches and migraines will cause excessive absenteeism and, therefore, preclude her from working. In other words, there are no medical source opinions, of any kind, that indicate that Plaintiff's migraine headaches will cause excessive absenteeism. Thus, while the ALJ found that Plaintiff's migraine headaches are a severe impairment, he also found that her subjective complaints about the limitations imposed by those headaches are overstated. Having discounted Plaintiff's credibility on the limitations imposed by her headaches, there was no evidentiary basis upon which to conclude that she would experience excessive absenteeism.

Moreover, at the hearing, the ALJ asked if Plaintiff recorded her headaches in some way, and she responded no. In addition, Plaintiff has not provided any evidence from any medical source that she would have more limitations during the relevant period, due to her headaches or other impairments. The ALJ ultimately concluded:

> Regarding the claimant's migraines, the claimant's allegations regarding the frequency and intensity of her headaches is not consistent with the medical evidence. The medical evidence shows some emergency room visits and other doctor visits due to headaches but that the claimant's headaches were generally controlled with medication.

(Tr. 63, PAGEID #: 107).

Consequently, the Court finds that substantial evidence supports the ALJ's step-five conclusion.

## IV. CONCLUSION

Based upon the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 12) be **OVERRULED**, and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.

Date: March 7, 2018                                      /s/ Kimberly A. Jolson
                                                         KIMBERLY A. JOLSON
                                                         UNITED STATES MAGISTRATE JUDGE